UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
In re:                                                          : Chapter 7
                                                                :
FURS BY ALBERT & MARC KAUFMAN, INC.,                            : Case No. 03-41301 (SMB)
                                                                :
                    Debtor.                                     :
                                                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                                :
ROBERT L. GELTZER, as Chapter 7                                 :
Trustee of FURS BY ALBERT & MARC KAUFMAN,                       :
INC.,                                                           :
                                                                :
                    Plaintiff,                                  :
                                                                : Adv. Proc. No. 05-1838
            v.                                                  :
                                                                :
FUR WAREHOUSE, LTD d/b/a KAUFMAN FURS,                          :
ALBERT KAUFMAN, JOAN KAUFMAN, HEIDI                             :
KAUFMAN, TAMMY KAUFMAN AND BARBARA                              :
KAUFMAN,                                                        :
                                                                :
                    Defendants.                                 :
-------------------------------------------------------------- X

**POST-TRIAL FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

**A P P E A R A N C E S:**

BRYAN CAVE LLP
Attorneys for Plaintiff
 1290 Avenue of the Americas
New York, New York 10104

    Robert A. Wolf, Esq.
    Andrea K. Fisher, Esq.
       Of Counsel

STUART P. GELBERG, ESQ.
Attorney for Defendants
600 Old Country Road, Suite 410
Garden City, New York 11530

**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge:**

The chapter 7 trustee commenced this adversary proceeding to recover damages arising from the conversion and misappropriation of the debtor's business, for a turnover of the misappropriated assets and to avoid and recover certain fraudulent transfers to or for the benefit of the individual defendants. The Court conducted a three-day bench trial, and now renders the following findings of fact and conclusions of law in accordance with FED. R. CIV. P. 52(a), made applicable to this adversary proceeding by FED. R. BANKR. P. 7052.

## BACKGROUND[1]

**A.    The Conversion/Misappropriation of the Debtor's Business**

The Debtor was formed in 1990. (Tr. (5/1), at 13.) At all relevant times, it was engaged in the business of selling fur coats at wholesale and retail as well as on consignment from other furriers, storing and cleaning fur garments, repairing fur coats and remodeling fur coats. (Tr. (5/1), at 13-14.) The business was located at 345 Seventh Avenue in Manhattan until April 22, 2002, when the Debtor was evicted.[2] (Tr. (5/1), at 15-16.)

Marc Kaufman ("Marc") was the sole shareholder and president of the Debtor. (Tr. (5/1), at 12-13.) Prior to forming the Debtor, Marc worked for his father's fur company, Albert Kaufman, Ltd, (Tr. (5/1), at 14), and many of the Debtor's customers had been customers of

---

[1] The following conventions are used in citing to the trial record. The daily transcript is cited by date and page. For example, "Tr. (5/1), at 10" refers to page 10 of the May 1, 2006 transcript. "PX" refers to the plaintiffs' trial exhibits.

[2] The Debtor leased the entire third floor, about 7000 square feet, at 345 Seventh Avenue. (Tr. (5/1), at 21-22.) It paid approximately $11,000 each month in rent. (See PX 39; Tr. (5/1), at 26-28.) The Debtor actually occupied only between 15% and 35% of the space, and sublet all or a portion of the remaining space, (Tr. (5/1), at 28- 29), including approximately 30% to Stroll Fashions/Fur Mart, its principal fur supplier. The latter paid $4,000.00 per month in sub-rent. (Tr. (5/1), at 29-30.)

Albert Kaufman, Ltd. (Tr. (5/1), at 17.) Marc filed his own bankruptcy case, received a discharge, and for this reason, was not named as a defendant in this lawsuit.

Much of the trial focused on the Debtor's operations in the latter half of 2001 and early 2002, and Marc's creation of a new company that took over the Debtor's customers and business. During 2001, the Debtor stored between 1,800 and 3,000 fur coats at its business premises. (PX 43, at 20; Tr. (5/1), at 17; PX 6, at 22.) It charged between $35 and $45 to store a coat and between $35 and $43 to clean it. (Tr. (5/1), at 18; Tr. (5/2), at 18; PX 43, at 24; PX 48, at 15; PX 23.) In the typical year, the Debtor's customers put their coats into storage between April and June, and took them out of storage between September and November. (Tr. (5/1), at 19.) Some customers prepaid for storage and cleaning when they brought the coat in; others paid when they picked it up. (Tr. (5/1), at 19.)

On or about July 10, 2001, Marc established Wholesale Fur Company, Ltd., which he incorporated for the purpose of conducting a fur business. (PX 18.) On or about March 6, 2002, Wholesale Fur Company, Ltd. changed its name to Fur Warehouse, Ltd., (PX 20), and does business under the name of Kaufman Furs. (PX 19.) As with the Debtor, Marc is the sole shareholder and president of Kaufman Furs. (Tr. (5/1), at 53.) Kaufman Furs conducted the fur business from the Debtor's premises until the Debtor's eviction; it then relocated to 208 West 29th Street, New York, New York. (Tr. (5/1), at 62.) During the period from July 2001, through April 2002, when Kaufman Furs conducted its fur business from the Debtor's premises, it utilized the Debtor's phone number (212-564-0050) and fax number (212-244-7845). Even after Kaufman Furs relocated to 208 West 29th Street, it continued to use the Debtor's phone number, and listed that phone number on its Internet site. (Tr. (5/1), at 63-64; PX 22.)

From the outset, Kaufman Furs engaged in the same lines of business as the Debtor. These included a retail fur business, (PX 43, at 46-47), a wholesale fur business, (PX 48, at 11-12; PX 49, at 37), and a fur storage, cleaning, remodeling and repair business operations.[3] (PX 43, at 47.) In fact, many of the customers who took their fur coats out of storage with the Debtor in the latter part of 2001 put them back into storage with Kaufman Furs in the spring of 2002, after the Debtor had been evicted.[4] (See Tr. (5/1), at 118.) Kaufman Furs recorded $295,000 in retail sales for 2001 (PX 48, at 21), and $1,035.243.86 in retail sales for 2002. (PX 49, at 82.) Many of those sales were made to former customers of the Debtor.[5] (Compare PX 23 (Debtor's Cash Receipts Journal) with PX 49 (Kaufman Furs' General Ledger).) And while Kaufman Furs was ramping up, the Debtor was winding down its business operations, and by year's end had essentially ceased operating. (Tr. (5/1), at 40, 56.)

Kaufman Furs also used many of the Debtor's employees. In 2001, the Debtor employed eight people in addition to Marc. They included Jack Jacobs (coat repairs), Helen Stamation (tailoring), Millena Gay (receptionist), Steven Karas (coat repairs), Albert Kaufman (coat pick ups), Barbara Kaufman (sales), Raymond Ozaria (errands and shipping) and Maisha Taylor (receptionist). (Tr. (5/1), at 36, 38; PX 17.) Barbara Kaufman, Ray Ozaria, Helen Stamation, Jack Jacobs and Maisha Taylor became employees of Kaufman Furs, performing the same or similar functions at Kaufman Furs that they did at the Debtor. (Tr. (5/1), at 54.) And while these employees performed services for Kaufman Furs commencing no later then September 2001,

---

[3] Kaufman also used the same vendors as the Debtor. Fur Mart and Stroll Fashions supplied the Debtor with approximately 90-95 percent of its furs in 2001. (Tr. (5/1), at 59; PX 4, at 180-181.) During 2002, Fur Mart and Stroll Fashions provided Kaufman Furs with 98-99 percent of its fur inventory. (PX 4, at 181; Tr. (5/1), at 60-61.) In addition, ATV and Bobbrick supplied furs and linings, respectively, to both companies. (Tr. (5/1), at 61-62.)

[4] Unlike the Debtor, Kaufman Furs stored the coats off premises.

[5] The Trustee contends that 452 of the customer names recorded in the Debtor's 2001 Cash Receipts Journal also appear in Kaufman Furs' 2002 General Ledger. The Trustee did not identify the 452 matches, and I am not inclined to confirm the accuracy of the Trustee's statement by comparing the hundreds of names in the two sets of financial records. Nevertheless, even a cursory comparison reveals that many of Kaufman Furs' customers in 2002 had been the Debtor's customers in 2001.

4

they were paid by the Debtor, not by Kaufman Furs, during the period September, 2001 through November, 2001. (Tr. (5/1), at 57-58; PX 39.) In fact, Kaufman Furs did not issue any Form W-2s in 2001. (Tr. (5/1), at 58.)

In addition, the Debtor made a down payment in the amount of $11,500.00 to Manhattan Jaguar on or about December 28, 2000, for the purchase of a silver Jaguar (the "Silver Jaguar"). (PX 38; Tr. (5/1), at 125.) In or about January of 2003, the Silver Jaguar was traded in for a Mercedes Benz, which was leased by Kaufman Furs. (PX 7, at 33.)

**B.    The "Kaufman Family Transfers"**

The Trustee has asserted fraudulent transfer claims against the individual defendants relating to the personal use of leased vehicles.[6] The cars were leased in Marc's name, but the Debtor paid some of the expenses associated with these vehicles. (Tr. (5/1), at 123-24.) According to the Debtor's 2001 Cash Disbursement Journal, the Debtor made lease payments in the aggregate amount of $5,205.86 to Banc One for a Lexus.[7] (See PX 39.) Marc's daughters, Heidi and Tammi, used the Lexus to drive to school, to their jobs, to shop and for other purely personal reasons. (Tr. (5/1), at 180-86 (Tammi's testimony); Tr (5/2), at 6-11 (Heidi's testimony).) There was no credible evidence that the Lexus was used for any corporate purpose.

---

[6]    The Complaint had also asserted fraudulent conveyance and unjust enrichment claims against the "Kaufman Family Defendants" based on the use of the automobiles. The unjust enrichment claim was not mentioned in the Joint Pre-Trial Order, dated Feb. 7, 2006 or in Trustee's post-trial submissions. Accordingly, it is deemed abandoned.

[7]    Marc testified, at trial, that the Cash Disbursement Journal was incorrect, and that there was another Lexus. I reject this testimony as not credible. The Trustee asked during discovery for documentation regarding the various car leases and payments. (PX 10, at 9, items 15-17)(Plaintiff's First Request For Production of Documents, dated Dec.12, 2005.) After nothing was forthcoming, he followed up the request on several occasions. (See PX 10A-E.) The only responsive document that was produced was the 2001 Cash Disbursements Journal.

The Debtor also made lease payments aggregating $4,534.45 on account of a Chevy Van.[8] (See PX 39.) The Chevy Van was kept at the home of Marc's father and step-mother, Albert and Barbara Kaufman. They made personal use of the Chevy Van, at least on the weekend, (PX 43, at 42-44; Tr (5/2), at 30-31), although the Chevy Van was also used for corporate purposes during the week.

Finally, the Trustee maintains that the Debtor also paid the insurance on these vehicles, and made payments in 2000.

## DISCUSSION

**A.    Misappropriation/Conversion Claims**

    **1.    Diversion of Business**

There was ample evidence in the record to support the Trustee's contention that Kaufman Furs diverted the fur storage and cleaning businesses[9] from the Debtor. According to Marc, the Debtor stored between 1800 and 2000 coats during 2001 at its premises. (Tr. (5/1), at 17.) Barbara, who was more intimately involved in this aspect of the business, placed the number at 2,500. (PX 43, at 20.) The Debtor charged between $30 and $35 to store and clean a coat, or between $60 and $70 for both services. (Tr. (5/1), at 18; Tr. (5/2) at 18.)

By the time that the next storage season began in April 2002, the Debtor was out of business. Marc and Albert called the Debtor's former customers, and solicited their storage business for 2002. (Tr. (5/1), at 118.) While it is true that the Debtor lost its lease in April, and hence, its storage facilities, that is beside the point. Kaufman Furs stored the coats off premises

---

[8]    The Chevy Van is referred to as a Chevy Truck in the Debtor's Cash Receipts Journal.

[9]    The Trustee limited his business diversion claim to the fur storage and cleaning business.

6

at a facility operated by Central Fur Storage, and the Debtor could have done the same even without a new lease.[10]

In fact, Marc viewed the Debtor and Kaufman Furs simply as the continuation of the original family fur business. According Kaufman Furs' website, "[w]e at Kaufman Furs are a family owned and operated fur Wholesale – Retail business, since 1910." (PX 22.) Marc's suggestion that Kaufman Furs was a new business designed to sell over the Internet is not credible. Rather, the family business simply entered the Internet age. It used the Internet as well as the traditional methods to sell furs, and continued to conduct the same wholesale/retail fur business that it had been doing for nearly 100 years. In any event, Kaufman Furs did not store or clean coats through the Internet; it delivered the coats to Central Fur Storage.

The Trustee's evidence fell short, however, when he tried to place a value on the diverted business. The Trustee called Andrew Plotzker, a CPA, as a valuation expert. Using an average combined storage and cleaning cost of $75 per coat, Plotzker multiplied this number by 2500 coats ($187,500), subtracted $32,000, the average annual amount that the Debtor and/or Kaufman Furs paid to Central Fur Storage for 2001 and 2002, and arrived at a net revenue of $155,500.00. (Tr. (5/2), at 55.) Plotzker then multiplied that revenue number by two, the amount he thought an arms-length purchaser would most likely be willing to pay for these components of the Debtor's fur business. (Tr. (5/2), at 58-59.) He opined that the Debtor suffered damages of at least $312,000 from the diversion of the storage and cleaning business. (Id. at 59.)

---

[10] The evidence suggests that Kaufman Furs may have conducted a storage business in 2001, because its 2001 General Ledger reflects a few payments to "Central Furs." The majority of the payments, however, are listed as "purchases." (See, e.g., PX 48, at 2, 6.) Only one entry is listed as a "cleaning" expense. (See id., at 7.) In addition, the General Ledger lists purchases from an entity named "Center Furs." It is not clear whether this is the same entity or a different entity, and if the latter, whether the bookkeeper observed the distinction.

There were several problems with Plotzker's analysis. Initially, he may have overstated the revenue stream. He estimated a storage cost of $40 per coat (plus $3.30 in tax) based upon entries in the Debtor's Cash Receipts Journal. (See Tr. (5/2), at 120.) He also assumed a cleaning cost of $40 per coat, (Tr. (5/2), at 54), and used $75 (instead of $80) for storage and cleaning per coat. He multiplied the $75 by 2500, the number of coats that were stored. In other words, he assumed that everyone who stored a coat had it cleaned, and vice versa. But the fact that the Cash Receipts Journal indicated receipts of only $43.30 from some customers implied that those customers did not contract for both services.

Plotzker's analysis also ignored the incremental costs of running a fur storage and cleaning business. He made only one deduction from gross revenue – the amount that Kaufman Furs paid annually to Central Fur Service. Even if Kaufman Furs did not have to rent any other premises for this line of business, it had to employ people to pick up the coats from the customers in the spring and bring the coats to Central Fur Storage, and reverse the procedure in the fall when it came time to return the coats to the customers. He ignored these costs, (see Tr (5/2), at 115), although he admitted that they should be considered in conducting an enterprise valuation. (Id. at 116.)

Finally, Plotzker's valuation expertise was open to question. The defendants did not object to his qualifications, (see Tr. (5/2), at 44), but the Court questioned his expertise at the trial. (Id. at 84.) His expertise was in forensic accounting, (see id. at 36), and insolvency analysis. (See id. at 38.) While he had valued fur company assets "on hand" three or four times for the purposes of funding,[11] (Tr. (5/2), at 38-39), his testimony did not reflect any training, education or experience in enterprise valuation, or the related topic of damages suffered from the

---

[11] I assume he was referring to funding or lending based on the value of the underlying collateral, namely fur coats.

8

diversion of a business. Furthermore, Plotzker did not investigate whether other, comparable sales had occurred. (See Tr. (5/2), at 114.) Lastly, he plucked the 200% multiplier out of the air. He had no knowledge regarding what multiple of revenue a buyer might be willing to pay, and did not develop any ratios based on other sales because he did not inquire into similar transactions. In short, his opinion regarding value amounted to speculation based on overstated revenue, understated expense and unsupported ratios.[12]

### 2. The Allocation of Expenses

#### a. Labor

While the Trustee failed to provide sufficient evidence of damages in support of his diversion of business claim, he faired much better showing that Kaufman Furs was unjustly enriched by the Debtor's payment of Kaufman Furs' operating expenses. The elements of an unjust enrichment claim under New York law are (1) a benefit to the defendant (2) at the plaintiff's expense which (3) in "equity and good conscience" should be restored. Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000).

During 2001, the two companies operated side-by-side, and the Debtor and Kaufman Furs recorded gross receipts (less allowances) of $628,994, (PX 25), and $ 295,326, (PX 27), respectively. Yet the Debtor paid all of the labor costs incurred by both companies. These costs included $67,500 to the officers, $123,200 in salaries and wages to the other employees, and $9,164 on account of the Debtor's employee benefit program, for a total of $199,864. (See PX 25.) Kaufman Furs' 2001 income tax return does not reflect the payment of any labor costs.

Kaufman Furs plainly benefited from the Debtor's payment of its labor costs in 2001, and Kaufman should, "in equity and good conscience," repay some portion to the Debtor's estate.

---

[12] Plotzker also computed damages by attributing every sale by Kaufman Furs for less than $300 to storage and cleaning. The Trustee is not relying on this calculation. (See Plaintiff's Reply to Defendant's Proposed Post-Trial Findings of Fact and Conclusions of Law, dated Sept. 19, 2006, at ¶ 15)(ECF Doc. # 32.)

9

Moreover, Marc was a fiduciary of both companies, and through Kaufman Furs, orchestrated the uncompensated diversion of the Debtor's labor force in breach of his fiduciary duty to the Debtor. Consequently, Kaufman Furs was required to show the portion of the labor-related expenses that it, in fairness, should have borne. See New York State Teamsters Council Health & Hosp. Fund v. Estate of DePerno, 18 F.3d 179, 183 (2d Cir. 1994).

It failed to offer any evidence of an appropriate allocation. The Trustee, for his part, proposes to charge Kaufman with 100% of the average monthly salaries paid by the Debtor in September, October and November 2001, or $47,676.00. (See Plaintiff's Proposed Post-Trial Findings of Fact and Conclusions of Law, dated July 19, 2006, at ¶ 111)(ECF Doc. # 22.) This, however, assumes that the employees worked only for Kaufman Furs during these months, but this assumption is unwarranted. Those who stored fur coats with the Debtor in the spring of 2001 picked the coats up during the fall, and at least some services were rendered on behalf of the Debtor.

Where, as here, the unfairness is patent but the exact amount of restitution cannot be determined with precision, the Court may draw reasonable inferences from the proof to arrive at an appropriate allocation. Cf. Berley Indus., Inc. v. City of New York, 385 N.E.2d 281, 283 (N.Y. 1978)(discussing the award of damages in an action for breach of contract). I conclude that the labor costs should be allocated in the same proportion as the gross revenues. In 2001, Kaufman Furs grossed 31.95% of the aggregate revenue of the two companies, and it should have paid that portion of the 2001 labor costs, or $63,857.79.

By April 22, 2002, the Debtor was no longer operating. In 2002, the Debtor had limited receipts and did not pay any labor costs. (See PX 26.) Accordingly, there are no labor costs in 2002 to reallocate to Kaufman Furs.

10

### b.   2001 Rent

The Debtor paid approximately $11,000 each month in rent to Bernstein Real Estate, its landlord, although it received sub-rent from its sub-tenants. Through September, the Debtor paid the full amount, and Kaufman Furs paid nothing. In October 2001, this changed. The Debtor paid only $ 4,017.42, (PX 39 (October 2001, at 2)), and Kaufman Furs paid $8,000 to Bernstein Real Estate. (PX 48, at 4.)[13] Kaufman Furs paid $7,500 to Bernstein Real Estate in November, (see PX 48, at 5), and $10,454.01 in December.[14] (Id. at 7.) The Debtor did not pay any rent during remainder of 2001, but from October through December, collected $13,569.17 in sub-rent. (See PX 23.)

The foregoing makes an award to the Debtor unwarranted. According to the Debtor's 2001 income tax return, it paid $47,024 in rent. I assume that this reflects the net rent paid by the Debtor because it collected sub-rent, and the 2001 income tax return does not list the sub-rent as "Other Income." Thus, it appears that the two companies actually paid the aggregate amount of $72,978.01 in rent, inclusive of the reduction based on the collection of sub-rent, and Kaufman Furs paid over 35% of that amount. The 2001 Kaufman Furs tax return suggests a lower rent payment, but it is impossible to reconcile the two sums, and any award would be speculative if, indeed, an award could be justified.

### c.   2002 Rent

Kaufman Furs continued to occupy the Debtor's premises until the Debtor was evicted on April 22, 2002. According to Kaufman Furs' 2002 General Ledger, it paid $10,820.00 directly to the Debtor's landlord on January 7, 2002, (see PX 49, at 102), but did not pay anything to the

---

[13] The Kaufman Furs 2001 General Ledger indicates that the payment was for September rent, but this seems to be an error. The Debtor had paid the full September rent on September 5, 2001. (See PX 39.) In addition, the Debtor only paid a portion of the October rent. Consequently, the reference to "September" in the Kaufman Furs General Ledger is probably wrong, and should read "October."

[14] These entries are inconsistent with Kaufman Furs' 2001 income tax return, which lists a rent expense of $12,466. No explanation was offered for the discrepancy.

11

Debtor during 2002 and prior to the eviction. (See id.) The Debtor's 2002 income tax returns did not list any rent expense, and I assume that no rent payments were made.

The ratio of receipts between the two companies changed dramatically during 2002, and the Debtor stopped operating in April 2002. Historically, the Debtor's monthly net rent had been approximately $4,000, or $16,000 for the four months that Kaufman Furs operated from the premises. As noted, Kaufman Furs paid nearly $11,000 directly to the Debtor's landlord.

I decline to apportion the 2002 rent. Unlike the situation where the Debtor paid its employees but Kaufman Furs benefited from their labors, the Debtor did not pay any rent; in fact, Kaufman Furs paid the rent in order to avoid eviction. Since the Debtor apparently conducted some operations in 2002 prior to the eviction,[15] Kaufman Furs' payment benefited the Debtor rather than the other way around. Apportioning rent that the Debtor never paid would simply grant a windfall to the creditors. It is true that the Debtor scheduled the landlord's unsecured claim in the amount of $85,000.00, (see PX 9, Schedule F), but the claim is not worth that much, and on balance, an award is not appropriate.

### 3. The Collection of Sub Rent

As noted, the Debtor sublet a portion of its business premises, and collected subrent. Kaufman Furs' 2002 General Ledger, (PX 49), and 2002 federal income tax return, (PX 28), reflect the collection of rental income in the amount of $53,520.00. This sum consisted of the following four payments:

| Date of Payment | Payor | Amount |
|---|---|---|
| 01/07/02 | Stroll Fashion | 8,920.32 |
| 01/09/02 | Fur Mart, Inc. | 42,000.00 |

---

[15] The Debtor's 2002 tax return reported total receipts of $27,899. (PX 26.)

12

| 01/11/02 | McQuay Design | 1,300.00 |
| 02/12/02 | McQuay Design | 1,300.00 |

(PX 47, at 105.)

There is no dispute that the amounts paid by Stroll Fashion and McQuay Design were subrent. The payments belonged to the Debtor, and should have been turned over by Kaufman Furs. Stroll's rent varied a bit, but according to the Debtor's 2001 Cash Receipts Journal, it paid approximately $4,500 each month. It did not pay subrent in December 2001, and the January payment in the amount of $8,920.32 matched the sum of two months worth of rent. Similarly, the two payments by McQuay, each in the sum of $1,300, were the exact monthly rent that McQuay paid in 2001.

The Fur Mart payment of $42,000, although booked as rent, plainly covered something else. Fur Mart had never paid subrent according to the Debtor's 2001 Cash Receipt Journal. Furthermore, the amount of the payment did not correspond to any rent or subrent obligation. On the other hand, Fur Mart bought and sold furs, (Tr. (5/1), at 93), and I find that the $42,000, while possibly a payment on account of a purchase, was not a payment on account of subrent. Accordingly, the Trustee is entitled to recover the Stroll and McQuay payments from Kaufman Furs. He is not, however, entitled to recover the amount of the payment that Fur Mart made to Kaufman Furs.

    **4. Computer Expenses**

On July 6, 2001, the Debtor paid $3,000 to HBN with three separate checks. (PX 39.) HBN was an entity that started Kaufman Furs' website, and never performed any services for the Debtor. (Tr. (5/1), at 112-113.) Kaufman Furs was incorporated as Wholesale Fur Co., Ltd. only

four days after the HBN bill was paid. (See PX 18.) The aggregate $3,000 payment was for the benefit of Kaufman Furs, and the estate is entitled to recover that sum.

### 5. The Jaguar

On or about December 28, 2000, the Debtor made a down payment in the amount of $11,500 to Manhattan Jaguar, for the purchase of the Silver Jaguar. (PX 38; Tr. (5/1), at 125.) It does not appear that the Debtor paid the balance of the purchase price, or that it took title to the Silver Jaguar. In or about January of 2003, the Silver Jaguar was traded in for a Mercedes Benz, which was leased by Kaufman Furs. (PX 7, at 33.) The trade-in presumably resulted in a credit against the new lease obligation.

The Trustee argues that he is entitled to an award of $11,500 based on the credit that Kaufman Furs received at the time of the trade-in, but I reject this for two reasons. First, the Trustee failed to show the value of the Jaguar in January 2003. I cannot take judicial notice that it was worth at least $11,500, and hence, that Kaufman Furs received a credit in that amount. Second, the Debtor paid only $11,500 toward the Silver Jaguar, and someone else paid the balance of the purchase price. There is no evidence from which I could compute the percentage of the purchase price that the Debtor paid. Furthermore, the estate would only be entitled to a proportionate award based on that percentage multiplied by the value of the Silver Jaguar at the time of the trade-in.

### B. The Claims Based on the "Kaufman Family Transfers"

The Trustee also asserted fraudulent conveyance claims under New York law arising from the use of the Lexus and the Chevy Van. Under 11 U.S.C. § 544(b)(1), the Trustee may avoid a transfer by showing that the transfer could have been avoided by an unsecured creditor under the New York Debtor and Creditor Law ("NYDCL"). A person challenging a transfer as

14

constructively fraudulent under the NYDCL must show (1) a transfer of the debtor's property, (2) made without fair consideration, and (3)(a) the debtor was insolvent or was rendered insolvent by the transfer, NYDCL § 273, (b) the debtor was left with unreasonably small capital, id., § 274, or (c) the debtor intended or believed that it would incur debts beyond its ability to pay when the debts matured. Id., § 275. See Geron v. Schulman (In re Manshul Constr. Corp., No. 97 Civ. 8851, 2000 WL 1228866, at *51 (S.D.N.Y. Aug. 30, 2000); MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co., 910 F. Supp. 913, 936 (S.D.N.Y. 1995); Le Café Creme, Ltd. v. Le Roux (In re La Café Creme, Ltd.), 244 B.R. 221, 240-41 (Bankr. S.D.N.Y. 2000).

If the Trustee avoids the transfer, he may recover the transfer, or its value, to the extent allowed by 11 U.S.C. § 550. The latter provides:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from –
>
> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>
> (2) any immediate or mediate transferee of such initial transferee.

At trial, the Trustee proved that Heidi and Tammi used the Lexus for personal reasons, and that Barbara and Albert used the Chevy Van, in part, for personal reasons. Nevertheless, the Trustee's fraudulent transfer claims fall short for two reasons. First, he failed to show that the Kaufman Family Defendants were "transferees" of the Debtor's interest in property. Marc leased the vehicles in his own name. The Debtor did not have an interest in the vehicles, and the use of the vehicles did not constitute a transfer of an interest in the Debtor's property. Although the lease (and insurance) payments met the definition of a transfer, the Kaufman Family Defendants were not the transferees of these payments either. The lease payments went to the

15

leasing companies, and the insurance payments were paid to the insurance companies or to a broker.

At most, the Kaufman Family Defendants were entities for whose benefit the payments were made within the meaning of 11 U.S.C. § 550(a). The Trustee cannot recover the value of the transfer from any of the transferees or beneficiaries unless he first avoids the underlying transfer. This requirement, and its rationale, were discussed and explained by Bankruptcy Judge Gonzalez in <u>Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.)</u>, 343 B.R. 75, 79-83 (Bankr. S.D.N.Y. 2006), and there is nothing I need to add. The Trustee has not avoided these transfers, and accordingly, has failed to prove an essential element of his right to recover under § 550(a).

The Trustee is directed to settle a proposed judgment consistent with this opinion. He is also entitled to costs and interest to the extent permitted by New York law, and his proposed judgment should attach a Statement of Judgment that shows how the interest costs were computed.

Dated:  New York, New York
        December 14, 2006

                                            /s/ *Stuart M. Bernstein*
                                            STUART M. BERNSTEIN
                                            Chief United States Bankruptcy Judge